UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS,

                    Plaintiff,

          v.

LASHWAY LUMBER, INC. and LASHWAY
LOGGING, INC.,

                    Defendants.

Case No.

**COMPLAINT**

**INTRODUCTION**

1.      Lashway Lumber, Inc. ("Lashway Lumber") operates a timber products facility at and around 22 Main Street, Williamsburg, Massachusetts (the "Lashway Lumber Facility"), and Lashway Logging, Inc. ("Lashway Logging") operates a timber products facility at and around 59 and 67 Main Street, Williamsburg, Massachusetts (the "Lashway Logging Facility") (together, the "Lashway Facilities" or the "Facilities").

2.      Lashway Lumber and Lashway Logging (each occasionally referred to as a "Lashway Company" or jointly referred to as the "Lashway Companies") have discharged industrial stormwater into the Mill River and/or its associated creeks and wetlands without obtaining and complying with a federal stormwater permit issued by the United States Environmental Protection Agency ("Stormwater Permit"), in violation of the Federal Clean Water Act, 33 U.S.C. § 1311(a).

3.      The land surface at the Facilities is strewn with significant and concentrated amounts of woody carbon-based compounds such as logs, boards, sawdust, mulch, and other fine

or coarse wood matter ("Industrial Materials") in various stages of decomposition. Rain and snow melt (jointly "stormwater") that lands on and runs over the Facilities comes into contact with these Industrial Materials and mobilizes them. The stormwater then runs down from the Facilities into the Mill River and its tributaries, carrying with it organic matter from the Industrial Materials. The addition of organic matter to the Mill River and its tributaries has the potential to harm the aquatic environment and aquatic organisms and to alter important species habitat.

4.      The Mill River has been designated by the Commonwealth as a Coldwater Fish Resource and is habitat for several rare and endangered species. The area of the Mill River in the vicinity of the Facilities has been designated as "Core Habitat" essential to ensuring the long term persistence of plant and animal species of conservation concern.

5.      Excessive discharges of organic matter like the woody materials discharged from the Facilities pose a significant risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing other aquatic organisms or, in severe cases, asphyxiating them. The decomposition process allows small organic particles to break away and become silt-sized organic particles. When suspended in a waterbody, these particles can harm and kill fish by clogging their gills, making it harder for them to breathe. Silt-sized organic particles can filter out sunlight, and harm aquatic plants that engage in photosynthesis. A decline in photosynthesis further harms aquatic environments by reducing the presence of oxygen – a by-product of photosynthesis. When settled, silt-sized organic particles can smother aquatic organisms and their eggs. Furthermore, certain chemical pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to organic material and are picked up in runoff

as it flows across the land. Stormwater contaminated with these pollutants can significantly impact water quality when it is discharged to rivers and other waterbodies.

6.     The Lashway Companies' discharges of stormwater to the Mill River and its tributaries are in violation of the Clean Water Act. The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress the Lashway Companies' illegal discharges of pollution.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

8.     On March 12, 2019, the Commonwealth provided notice of the Lashway Companies' violations of the Clean Water Act, and of its intention to file suit against the Lashway Companies (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to the Lashway Companies, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

9.     More than sixty days have passed since notice was served.

10.     This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

11.     The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are

being, and will continue to be adversely affected by the Lashway Companies' failure to comply with the Clean Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by the Lashway Companies' activities. The Lashway Companies' continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

12.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

13.     Plaintiff is the Commonwealth, appearing by and through the Attorney General.

14.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

15.     Defendant Lashway Logging, Inc. is a domestic corporation that operates a timber products business, with its principal address listed as 67 Main Street, Williamsburg, Massachusetts. Lashway Logging, Inc. does business as "Lashway Forest Products."

16.     Defendant Lashway Lumber, Inc. is a domestic corporation that operates a timber products business, with its principal address listed as 22 Main Street, Williamsburg, Massachusetts.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

17.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge

Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C.
§§ 1311(a), 1342(a), 1342(p).

18.     Stormwater is the leading cause of water quality impairment in Massachusetts.
During every rain or snowmelt event, runoff flows over the land surface, picking up potential
pollutants such as sediment, organic matter, nutrients, metals and petroleum by-products. Polluted
stormwater runoff can be harmful to plants, animals, and people. Excess organic matter may
deplete oxygen in waterbodies, impairing or killing aquatic organisms. Excess sediment and other
solids cloud the water and destroy aquatic habitat, making it difficult or impossible for many
existing species in the water to grow, and increasing the presence of nuisance species. Excess
nutrients cause algae blooms that reduce dissolved oxygen in the water column, harming fish and
other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create
health hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick
from eating diseased fish or ingesting polluted water.

19.     Impacts from stormwater pollution pose particular risks to wetlands. Wetlands are
among the most productive ecosystems in the world, comparable to rain forests and coral reefs.
Wetlands play an integral role in the ecology and hydrology of the watershed. The combination of
shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of
organisms that form the base of the food web and feed many species of fish, amphibians, shellfish,
and insects. Many species of birds and mammals rely on wetlands for food, water, and shelter,
especially during migration and breeding. The holding capacity of wetlands also prevents floods
and erosion. Wetlands function as natural sponges that trap and slowly release surface water, rain,
snowmelt, groundwater, and flood waters. Trees, root mats, and other wetland vegetation also slow
the speed of flood waters and distribute them more slowly over the floodplain. Wetlands store

carbon within their plant communities and soil instead of releasing it to the atmosphere as carbon dioxide. Thus wetlands help to moderate global climate conditions. Stormwater contaminated with excessive organic matter or other solids can harm wetlands by, among other things, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Solids can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and water quality and significantly increase the risk of flooding.

20.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

21.     Timber products facilities that discharge industrial stormwater to waters of the United States directly or through separate storm sewer systems are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-1.

22.     The Stormwater Permit requires these facilities to, among other things:

a.      prepare a stormwater pollution prevention plan ("SWPPP") that, among other things, describes the facility and identifies all stormwater outfalls, Stormwater Permit, pg. 31;

b.      submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

c.      ensure that pollutant control measures minimize pollutants in stormwater discharges, Stormwater Permit, pg. 14;

d.      locate materials, equipment, and activities to contain potential spills, Stormwater Permit, pg. 15;

e.      minimize erosion by stabilizing exposed soils at the facility and use structural and non-structural control measures to minimize the discharge of sediment, Stormwater Permit, pg. 17;

f.      evaluate for and eliminate unauthorized non-stormwater discharges, Stormwater Permit, pg. 19;

g.      ensure that stormwater discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 20;

h.      implement specific best management practices applicable to timber products facilities, Stormwater Permit, pgs. 54-55;

i.      monitor stormwater discharges from all outfalls for compliance with benchmarks applicable to timber products facilities, Stormwater Permit, pgs. 55-56;

j.      report all monitoring results for all facility outfalls to EPA by specified deadlines, Stormwater Permit, pgs. 48-49;

k.      conduct corrective action to expeditiously eliminate excessive stormwater pollution and unauthorized non-stormwater discharges, Stormwater Permit, pgs. 27-29;

l.      conduct routine facility inspections at least quarterly (Stormwater Permit, pg. 22) and quarterly visual assessments (Stormwater Permit, pg. 24) to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not, Stormwater Permit, pgs. 22-26;

m.     timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, pgs. 49-50; and

n.     comply with any additional Massachusetts requirements, including but not limited to the requirements of the Massachusetts Clean Waters Act and its implementing regulations. Stormwater Permit, pg. 170.

*Citizen Suit Provision of the Federal Clean Water Act*

23.     Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

24.     The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act, because it is a "person" having an interest which is or may be adversely affected. *See* 33 U.S.C. § 1365(g).

25.     Under Section 505 of the Act, this Court has authority to enjoin the Lashway Companies' violations of the Act's prohibition on unauthorized discharges of pollutants and to require the company to comply with its Stormwater Permit. The Court also has authority to impose

penalties of up to $54,833 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 84 Fed. Reg. 2058 (Feb. 5, 2019).[1]

## STATEMENT OF FACTS

### Description of the Lashway Companies' Facilities & Activities

26.     Lashway Lumber operates a diverse wood products business and describes itself as "one of the leading logging companies in the area …."

27.     According to Lashway Logging's web site, the company offers a "soup to nuts" approach to lumber needs, "from cutting down timber stands to selling refined finishing wood grades and everything in between."

28.     The Lashway Companies operate their timber product businesses on the Facilities.

29.     The Lashway Facilities together comprise approximately 24 acres of mostly deforested land just upland of the Mill River and its tributaries. Lashway Lumber discharges stormwater from the Lashway Lumber Facility and Lashway Logging discharges stormwater from the Lashway Logging Facility into the Mill River or its tributaries either directly or via municipal catch basins. The approximate locations of the Lashway Facilities are shown in the following annotated aerial photograph.

---

[1] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.



Source: MassDEP Online Map Viewer:  Wetland and Wetland Change Areas Map. Red polygons show approximate location of Facilities (added by Attorney General's Office). Green lines mark approximate boundary of wetlands (in the original). Dark blue lines show creeks and hydrological connections (in the original). Light blue lines show location of Mill River.

30.     Facility #1 in the above annotated aerial photograph is the Lashway Lumber Facility and is located in and around 22 Main Street. Polluted industrial stormwater from the Lashway Lumber Facility discharges down an unnamed paved road that bisects the Facility ("Unnamed Road") and flows into a creek and wetlands to the north and northeast of the Facility that are tributaries to the Mill River (the "Tributary Creek"). Polluted industrial stormwater is also discharged directly into the Tributary Creek via channels and gulleys in and around piles of woody material that Lashway Lumber stockpiles on the northern edge of the Lashway Lumber Facility. See Attachment A.

31.     Facility #2 in the above annotated aerial photograph is part of the Lashway Logging Facility and is located at 59 Main Street. Industrial stormwater from Facility #2 is conveyed to Joe Wright Brook, which flows to the Mill River, via channels and gulleys in and around piles of logs

and other woody materials that Lashway Logging stockpiles on the eastern side of Facility #2. See Attachment B.

32.     Facility #3 is part of the Lashway Logging Facility and is located in and around 67 Main Street. Industrial stormwater from Facility #3 is conveyed to catch basins on the western edge of Facility #3 and thence to the Mill River. See Attachment C.

### The Mill River and its Tributaries

33.     The Mill River is a 13.5-mile-long tributary of the Connecticut River that originates in Ashfield and runs through several towns before its confluence with the Connecticut River in Northampton. Once the location of serious flood events, today, the river knits together a diverse landscape and offers numerous recreational opportunities. The Mill River has been designated by the Commonwealth as a "Coldwater Fish Resource." Coldwater Fish Resources are particularly sensitive habitats used by reproducing coldwater fish to meet one or more of their life history requirements.

34.     The portion of the Mill River in the vicinity of the Lashway Facilities is within an area designated by the Commonwealth as "Priority Habitat" for a state-listed rare species of dragonfly known as the Ocellated Darner.

35.     Other state-listed rare species exist downstream of the Facilities, and their habitat may be impacted by the Lashway Companies' stormwater discharges. These species include the Wood Turtle and four state-listed mussels.[2] Mussels are particularly sensitive to riverine pollutants.

36.     The tributary creeks and wetlands within the Mill River watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, for preventing

---

[2] These include the Dwarf Wedgemussel (which is also federally listed as Endangered under the federal Endangered Species Act), the Yellow Lampmussel, the Eastern Pondmussel, and the Creeper.

downstream flooding, and by providing natural habitats to native species. The Mill River in the vicinity of the Facilities has been designated by the Commonwealth as "Core Habitat" critical for the long-term persistence of rare species and other species of conservation concern. According to the Massachusetts Department of Fish & Game, protection of Core Habitat "is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes across Massachusetts."[3]

## The Lashway Companies' Operations

37.     The Lashway Companies engage in a variety of lumber processing activities, including logging, sawing, drying and mulching. The Lashway Companies process logs and other wood material into various products including different sizes of planks, boards, pallets, firewood, and bark mulch.

38.     The Lashway Companies store Industrial Material in outdoor piles located at various locations at their respective Facilities.

39.     The Lashway Companies move Industrial Material around their respective Facilities using trucks, tractors, and other heavy equipment ("Equipment").

40.     The Lashway Companies' Industrial Material consists of organic matter.

41.     Industrial Material and pollutants that are present in or adhere to Industrial Material (collectively, "Pollutants") become mobilized by Equipment at the Lashway Facilities and are tracked around and off the Facilities by Equipment.

## The Lashway Companies' Discharge of Pollutants from the Facilities

*Polluted Stormwater Discharges to the Mill River and its Tributary Wetlands and Creeks*

---

[3] Massachusetts Department of Fish & Game, Division of Fisheries & Wildlife and The Nature Conservancy, BioMap2: Conserving the Biodiversity of Massachusetts in a Changing World (2010).

42.     Industrial Material at the Facilities is exposed to precipitation.

43.     Pollutants become mobilized by stormwater.

44.     Since at least November 1, 2014, during rain events, Lashway Lumber, Inc. and Lashway Logging, Inc. have discharged polluted stormwater off of their respective Facilities and into the Mill River and its Tributary Wetlands and Creeks from several locations, including but not limited to the following:

   a.    Lashway Lumber has discharged polluted stormwater onto the unnamed road and northeast to the Tributary Creek (*see* Attachment A);

   b.    Lashway Lumber has discharged polluted stormwater into the Tributary Creek from channels and gulleys in and around piles of woody material that Lashway Lumber stockpiles on the northern edge of Facility #1 (see Attachment A);

   c.    Lashway Logging has discharged polluted stormwater into Joe Wright Brook via channels and gulleys in and around piles of logs and other woody materials that Lashway Logging stockpiles on the eastern side of Facility #2 (see Attachment B); and

   d.    Lashway Logging has discharged polluted stormwater into catch basins on the western edge of Facility #3 and thence to the Mill River (see Attachment C).

45.     Pollutants at the Lashway Lumber Facility adhere to and are tracked off of the Facility and onto the Unnamed Road by Equipment (for example, tires and treads). Pollutants from the Lashway Lumber Facility that are tracked onto the unnamed road by Equipment are picked up in stormwater and discharged into the Tributary Creek via runoff down the unnamed road.

46.     Pollutants at the Lashway Logging Facility adhere to and are tracked off of the Facility and onto Main Street, Depot Road, and Kellogg Road by Equipment. Pollutants from the Lashway Logging Facility that are tracked onto Main Street, Depot Road, and Kellogg Road by Equipment are picked up in stormwater and discharged into the Mill River via catch basins located on Main Street and Depot Road.

<em>The Lashway Companies' Failure to Comply<br>with Federal Stormwater Requirements</em>

47.     The Lashway Companies did not submit a Notice of Intent to be covered by the Stormwater Permit.

48.     The Lashway Companies did not comply with the terms of the Stormwater Permit.

<strong>FIRST CAUSE OF ACTION</strong><br><strong>Discharges of Industrial Stormwater Without a Federal Stormwater Permit:</strong><br><strong>Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)</strong>

49.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

50.     Lashway Lumber, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

51.     Lashway Logging, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

52.     The Mill River, the Tributary Creek, and Joe Wright Brook (collectively, the "Receiving Waters") are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

53.     Every day since November 1, 2014 to the present that Lashway Lumber discharged polluted stormwater from the Lashway Lumber Facility to a Receiving Water without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

14

1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

54.     Every day since November 1, 2014 to the present that Lashway Logging discharged polluted stormwater from the Lashway Logging Facility to a Receiving Water without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

55.     These violations establish an ongoing pattern by Lashway Lumber and Lashway Logging of failure to comply with the Stormwater Permit's requirements.

### SECOND CAUSE OF ACTION

**Noncompliance with the Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

56.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

57.     Since at the latest, December 1, 2013, the Lashway Companies have violated the Stormwater Permit by failing to:

  a.     prepare a SWPPP for their respective Facilities that, among other things, includes the location of all stormwater outfalls in the SWPPP (violation of section 5.2);

  b.     submit a "complete and accurate NOI" for their respective Facilities (violation of section 1.2.1);

  c.     ensure that pollutant control measures minimize pollutants in their stormwater discharges (violation of section 2.1);

  d.     locate materials, equipment, and activities to contain potential spills

(violation of section 2.1.2.1);

e.     minimize erosion by stabilizing exposed soils at their respective Facilities
       and use structural and non-structural control measures to minimize the
       discharge of sediment (violation of section 2.1.2.5);

f.     evaluate for the presence of and eliminate all non-stormwater discharges at
       their respective Facilities (violation of section 2.1.2.9);

g.     ensure that stormwater discharges do not cause or contribute to a violation
       of water quality standards (violation of section 2.2.1);

h.     implement specific best management practices applicable to timber
       products facilities (violation of section 8.A.3);

i.     monitor stormwater discharges from all outfalls for compliance with
       EPA's benchmark limits (violation of section 6.1.1);

j.     report to EPA monitoring results for all outfalls (violation of Section 7.4);

k.     take corrective action to eliminate non-stormwater discharges and address
       excessive pollutant discharges (violation of section 4.1);

l.     conduct routine and quarterly facility inspections to ensure, among other
       things, that control measures are functioning correctly and are adequate to
       minimize pollutant discharges (violation of sections 3.1 and 3.2);

m.     timely prepare and submit to EPA annual reports that include findings
       from the facility inspections and visual assessments and the
       documentation of corrective actions (violation of section 7.5); and

n.     comply with additional state requirements incorporated by reference into
       the Permit, including the Massachusetts Clean Waters Act and the

Massachusetts Wetlands Protection Act (violation of section 9.1.2.1).

58. Each of Lashway Lumber's violations of the requirement of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

59. Each of Lashway Logging's violations of the requirement of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

60. These violations establish an ongoing pattern by Lashway Lumber and Lashway Logging of failure to comply with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1. Require Lashway Lumber and Lashway Logging to each obtain coverage under and comply with EPA's federal Stormwater Permit at their respective Facilities;

2. Order Lashway Lumber and Lashway Logging to each pay civil penalties of up to $37,500 per day for each violation of the Federal Clean Water Act that occurred on or before November 2, 2015, and civil penalties of up to $54,833 per day for each violation of the Federal Clean Water Act that occurred after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a), 40 CFR § 19.4, and 83 Fed. Reg. 1190, 1193 (Jan. 10, 2018);

17

3.      Order Lashway Lumber and Lashway Logging to each take appropriate actions to restore the quality of protected areas impaired by its respective activities;

4.      Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.      Award any such other and further relief as this Court may deem appropriate.

Dated:   October 16, 2019

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

*Nora J. Chorover /s/*
Nora J. Chorover (Bar No. 547352)
Special Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2200, ext. 2436
Nora.Chorover@mass.gov